Thank you, good morning your honors. May it please the court, Megan Coleman on behalf of the appellant Rodney Coby. The conviction at issue in this appeal is Mr. Coby's conviction for distribution of a controlled substance resulting in the death of Angela Bailey. Mr. Coby contends, first, that the government failed to prove that the fentanyl distributed was the but-for cause of death, and alternatively failed to prove that the fentanyl was an independently sufficient cause of death. Second, it's our contention that the district court improperly instructed the jury that it could use a Pinkerton theory of liability to find Coby liable for the death results enhancement of count five, without any mention in the Pinkerton instruction that the jury must find that Coby was part of the chain of distribution. The sentence is also at issue in this appeal for two distinct reasons, one of which I'll focus on here today. The district court violated the ex post facto clause of the Constitution in applying a sentencing enhancement that was not in effect at the time the crimes were committed, and therefore improperly increased Mr. Coby's guidelines from a range of 360 months to life to life to life. And it's our position that that was error that substantially affected the rights of Mr. Coby and that this court should exercise its discretion to correct that error. With respect to the first issue in this appeal, it's our position that the government failed to prove beyond a reasonable doubt that the fentanyl in this case was the but-for cause of death. This case is unique because here the medical examiner, Dr. Allen, never testified that but-for the fentanyl taken by Bailey, that Bailey would have lived. Instead, the evidence in this record shows that Bailey could have died absent the fentanyl, either from DPF or from pharynal fentanyl. I understand it's conventional to shorthand the statute as saying dies as a result of the fentanyl, but don't we go back to the statute that doesn't actually say the fentanyl. It says a mixture or substance containing the fentanyl. And so isn't the actual question whether he died as a result of the mixture and substance containing the fentanyl whether than he died from the fentanyl? Your Honor, I understand that in this case it was charged. And the statute as well. I think that doesn't change the analysis. The reason being we still don't know what the mixture was that killed Angela Bailey. So let me just make sure I get this. So imagine that I sell someone something I tell them is heroin, but for some inexplicable reason I also cut it with a large amount of arsenic. And they take it and they die. They ingest the mixture or substance I gave them and they die. And it's clear they died because of the arsenic. I think under the statute I'm still liable under death resulting, right? Because even though arsenic is not, assuming arsenic isn't a crime. You see what I'm saying in that hypo. In that hypo I think I'm still liable, right? I do see what you're saying and I think it causes me to have to address the three potential theories of DPF in this case. The first being that DPF could have been a precursor to the fentanyl. And that would, I think, align with the hypothetical that you just gave that, well, what if the arsenic was mixed in with the fentanyl or with the other substance and it was thus part of the mixture. The second theory of DPF in this case was that it was a metabolite of pharynal fentanyl. And then the third theory was I would submit really just a theory never endorsed fully by medical reports and never endorsed by any of the experts in this case, which was that DPF could be possibly a very minor metabolite of the use of fentanyl itself. Let me start with the first incident of whether or not DPF was a precursor to the fentanyl. Why is this whole analysis necessary? In other words, we have a bunch of circumstances where the allegation is that Kobe sold her a mixture containing fentanyl and that death resulted. We have these various related chemicals to fentanyl. It's not a case where it shows up that she died of arsenic. It shows up she died from some aspect of fentanyl, maybe a precursor, maybe a metabolized version of it or whatever. And her urine tested positive for fentanyl, which is interesting to me because the urine is the more recent sampling event than would be the blood. And nobody made a big argument about that. But you go back to the circumstances of the whole event. She was buying drugs. She was dependent on Kobe. They made an arrangement. They met. They're put together. They don't actually see the actual transaction, but the circumstances suggest it. And a couple of hours after that transaction, a couple of hours later, she's dead. Those circumstances are very strong. And if it's possible, I mean, my question is now the analyses of her blood don't preclude that. What they do is you're saying it doesn't satisfy which element which caused it. But the fact is the only benefit you get from that is that maybe she had drugs from some other source that killed her. Yes. But the circumstantial evidence is so strong that that doesn't become that meaningful. She died from some aspect of fentanyl, and her urine showed positive for fentanyl. And with the other circumstances, parsing it to figure out the chemical, which chemical feature, where did it come from? Was it a precursor, or was it a metabolite of it, or was it a separate chemical? And you make a lot of it, and I understand it. You would like to have a perfect match so that the resulting would have to be closer. But if this gets to the basis of the statute, which is you distribute drugs and it results in death. And so, Your Honor, with that, what I would say is I think that that's what the importance is in this case. It is not just that Ms. Bailey used fentanyl, even if the fentanyl did come from Mr. Kobe. What's important is that the death resulted from the mixture containing the fentanyl that Mr. Kobe distributed. She did die conceitedly, didn't she, from intoxication? She died from a combination, which Dr. Allen was specifically pressed. Fair enough. So we know it's a drug death. Yes. If she didn't die from a heart attack, she didn't die from aneurysm or something else. I agree. She died from drugs. So now we have, she receives drugs from Kobe, by inference, of course. Of course. By inference, they communicate and she's addicted and she needs these drugs and they meet and she gives them drugs and two hours later she's dead. And not only that, purportedly he sold her fentanyl and we have residues of fentanyl in the things about her, where in the paper of her. And we have fentanyl in her urine and we have this crazy mixture in her blood. So the question is, he distributed fentanyl resulting in death. Did he distribute fentanyl resulting in death? And the jury comes back and said, yes. And I'm wondering what other conclusion in those facts could you reach? You could reach the conclusion here because Ms. Bailey was found at the scene of her death. There was a spoon containing for fentanyl. The toxicologist testified that DPF is a metabolite of the use of fentanyl and therefore the presence of DPF indicates that fentanyl could have been ingested. We also know that no DPF. But the question is, let's say it was ingested and it was from, it was part of this chemical mixture that was given to by Kobe. The real question is Kobe's distribution, illegal distribution of illegal substance resulting in death. And the only question is the linkage between what he purportedly sold and what was found. And to me that is. And they didn't do a chemical analysis of what he sold necessarily because, you know, you mix flour and baking soda or powder. You may test different parts and you haven't mixed well. And so it may test differently. But my question is, is there any other possibility that she died from drugs from some other source or some other person? Yes. Circumstantially? Not even circumstantially direct, Your Honor. There was testimony that Ms. Bailey was with Tina Hancock at the time of her death. Tina Hancock was a fellow drug user who herself was under the influence of drugs at the time of Ms. Bailey's death. Tina Hancock was the one that went to a stranger's house and asked them to call 911. There was a two-hour window that had passed between the last contact between Ms. Bailey's cell phone and the phone number attributed to Mr. Kobe and then the actual time of death of Ms. Bailey. So we know in that two-hour window that she was with another drug user who also was under the influence. Now we don't know what that other drug user was under the influence of. We also know that when the government executed the search warrant in this case and there was more than 200 grams of fentanyl discovered. You're talking about six weeks later or two months later? It was months later, Your Honor. That's irrelevant. Well, the court or excuse me, the government has not established that Mr. Kobe ever distributed a mixture containing DPF as a precursor to fentanyl or foranofentanil. Yet we know from the medical experts in this case that DPF intoxication alone could have been a cause of death. If there had not been fentanyl in the system, DPF intoxication standing alone would have sufficed. And that's different from what we've seen in other decisions in this circuit. In the Robinson case that the government included in their 28-J letter, there, even though the medical examiner never testified that the fentanyl was the but-for cause of death, there was no other evidence in the record that any other substance could have caused the death. Additionally, factually, the decedent died within five minutes of snorting the fentanyl. This, I would suggest, is a set of circumstances that is more similar to the Burrage case by the Supreme Court where you have a combination or a contributing cause but it doesn't rise to the level of but-for causation and it has not been established that fentanyl on its own was an independently sufficient cause of death. Let's look at the Pinkerton issue. So let me start by saying I think you have a difficult potential argument on preservation and I think you have a difficult potential argument on the merits because I'm not overwhelmingly persuaded that the Sixth Circuit's decision is right. But let me ask the work, what I think is the heart of the question, which is even assuming it's preserved, even assuming that you're right on the merits, why doesn't the special interrogatory on JA1141 say any error here was harmless when the deputy clerk says, did the government prove beyond a reasonable doubt that the use of fentanyl distributed by the defendant, Rodney Mundell Cobey, resulted in the death of Angela Bailey? And the foreperson says yes. Why doesn't that indicate that even if there was a problem, any error is harmless because the jury made the very finding the Sixth Circuit said that a jury would have to make? The argument that I can make here is that you have to look at the jury instructions as a whole, not just count one versus count five instructions. And so by saying that the special verdict alone is sufficient for this court to know that that's why the jury came to the count five conviction that it did, it ignores improperly, I would suggest, what was told in count one, which was that you don't have to necessarily be guilty of the substantive offense. You don't have to have personally committed those acts or been part of the chain of distribution. So long as you find that he is guilty on count one, you can, and the other factors that are part of Pinkerton liability, that's enough. And there was no instruction that if you're going to apply Pinkerton liability from the conspiracy, that you still have to find that Mr. Cobey was part of the chain of distribution. And so I recognize that the jury was told that it had to go through this checklist in the verdict and check off the counts of conviction. But the jury was also told that you don't have to find Mr. Cobey directly responsible for count five. You can also find him guilty of count five if you find that he was a member of the conspiracy and you find him guilty there. I recognize that the Ham opinion has not yet, it's been cited by a lot of other cases within the same circuit, within the Sixth Circuit where it's upheld the reasoning of Ham. I recognize that no other federal circuit has yet referred to Ham. Ham was only decided in 2020. What I would just like to say about why I think that the Ham's reasoning is persuasive. I would say what I find most questionable about it is that it seems to rely on the sentencing guidelines to interpret a federal statute, which seems to me, with all due respect, completely upside down and backwards. And I recognize that that would be a potential weakness that this court might look to. And so let me just offer this potential analogy for your honors to consider. In this circuit in Irvin in 1993, this court held that the district court had to determine that the quantity of narcotics was reasonably foreseeable to each individual co-conspirator prior to determination of the applicability of the mandatory minimum sentencing provisions. It rendered this holding notwithstanding that the plain language of Section 846 provides that any person who conspires to commit an offense in 841 shall be subject to the same penalties as those prescribed for the object of the conspiracy. So the importance of the Irvin case is that it recognized that notwithstanding that Congress said if you are a member of the conspiracy, then you're going to get the same penalties as a substantive offense, the Irvin court went on to say at page 75, rather than automatically rely on the quantity which would enhance the sentence, the court must determine if it's reasonably foreseeable. The sentencing provisions should be individualized to reflect a particular conspirator's relative culpability in the conspiracy. And the Irvin court even found some support for interpretation of the statute within the sentencing guidelines. It says that at page 77 of the opinion. It wasn't controlling of the ultimate holding, but it was a consideration. And that's similar to what the Hamm court said. It said even though our underlying decision in Swiney has been categorized as a sentencing guidelines case, that's not really the case. It was an interpretation of the language of 846 vis-a-vis 841 and how the sentencing guidelines also seem to narrow Pinkerton liability in the sentencing context. And I think that our precedent here in the Fourth Circuit from Irvin did a similar analysis with respect to the quantity of narcotics. Otherwise, any time a defendant in the Fourth Circuit is convicted of a conspiracy, he would be subject to the amount of narcotics attributable to the entire conspiracy. But we know that that does not happen in the sentencing context. Let me next, if I may, move to my third issue with respect to the sentence. Because even if I don't prevail with having the conviction for count five vacated, I do think that this is an exceptional case where the sentence must be remanded and a full resentencing hearing must occur. I don't want to presume that the court would also concede that error occurred as the government did. So I'm happy to address points one and two of clear error. But I think it is pretty well established from what the guidelines say that there is an ex post facto clause violation where a guideline enhancement is used at the time of sentencing that was not in effect at the time that the crime was committed. And here we know that the four-point sentencing enhancement went into effect in November of 2018, and the conduct in this case was 2017 through April of 2018. It's our position that the application of an upward departure to the guidelines affected Mr. Kobe's substantial rights, which is the third prong of plain error. The Supreme Court made it very clear in Molina-Martinez at page 203 that a defendant can rely on the application of an incorrect guidelines range to show an effect on his substantial rights. The defendant does not have to provide additional evidence in a case where the court applied an incorrect range but nevertheless sentenced the defendant within the correct range, which is what happened here. We submit that the government overlooks that the guidelines are a very real part of the court exercising its discretion in coming to the ultimate sentence. We know that case after case has said that the sentencing guidelines must be calculated properly. They are the anchor to the final sentence that is ultimately imposed. They are the framework. And here, contrary to the government's assertions, the district court did not just rely squarely on the 3553A factors in fashioning its sentence. This was an extremely lengthy sentencing proceeding where the guidelines issues were thought over by the district court, where he even took a 10-minute recess to ponder what the arguments about the guidelines were. And then the government expressly, during the 3553A factor argument, the government expressly asked that the district court, quote, sentence the defendant to the advisory guideline sentence of life. The government, quote, believes a sentence of life imprisonment, which is the guideline sentence, and no sentence less, reflects the seriousness of the offense and is sufficient to address the factors under 3553. We also know that the court struggled in reaching the final sentence of 40 years. The court was looking at whether to sentence Mr. Kobe to life, which was what the government was asking, which was the guideline sentence, and a sentence substantially less, still serious, but a sentence somewhere between 30 and 34 years. We also have precedent in this circuit that this court, on review of what occurred in the district court, must know that absent the guidelines error, the sentence would have been the same. The case law that the government cited to predated the 2016 Melina Martinez case, and now it is quite clear upon plain error review that a defendant does not have to show that his sentence would have been lower absent the guidelines error. The only way the government can get around it, which it cannot do on the facts in this case, is if the government were able to point to areas in the record where the district court made it clear so that this court can be certain, and those are words from Fourth Circuit precedent, where the district court made it clear that it would have still imposed the 40-year sentence notwithstanding any issues with the guidelines. The district court did not make such a pronouncement, and therefore, under Melina Martinez, the defendant has established his burden of plain error review in establishing that the error here impacted his substantial rights. All right, I think we'll take your rest. You're over. I apologize, and that was how I was going to conclude. Anyway, so thank you. You cut me off at the perfect time. But you do have rebuttal. I do have rebuttal. And you have a hunk of rebuttal. Thank you. All right. Why don't we hear Ms. Wright. Thank you, Your Honor. Good morning. May it please the Court. I am Elizabeth Wright, Assistant U.S. Attorney on behalf of the United States. As to all four issues this appeal presents, Defendant Rodney Coby's convictions and sentence should be affirmed. Turning first to the issue of the insufficiency of the evidence as to Count 5, I want to refer first to Judge Hyten's questions from the beginning, and yes, the question here is whether Angela Bailey died from the mixture and substance that Rodney Coby distributed. And responding to Judge Niemeyer's point, yes, she died from fentanyl-related causes. Everything relevant was in this singular mixture and substance that we think there is no question on the evidence presented that Rodney Coby distributed to her earlier on that day. She died within two to three hours of the essentially known meeting with Rodney Coby that was confirmed by the cell site location data and otherwise and corroborated by all of the text messages. And there is no indication whatsoever in the evidence here that she had any other source of supply. So we submit that this evidence is amply sufficient, especially on the standard applicable here to show both that Rodney Coby was the sole distributor to Angela Bailey during the relevant time period and that it was this singular mixture and substance that he distributed to her that killed her within hours of that distribution. The evidence to which the defense refers pertain to Tina Hancock. She was Stephen Jerome's mother, and essentially the evidence showed that Ms. Bailey and Mr. Jerome had driven up to this meeting with Coby and had come back down to that neighborhood. But there was no indication at all, despite the defense suggestion, that Ms. Hancock was using drugs at that time, that she had any other sources or anything like that. Can I ask you about what I think is the hardest issue for you, for the government? Please, Your Honor. The 2D1.1B12 issue. So, just as a threshold matter, I understand the government to agree the district court used the wrong guidelines manual here? That's correct, Your Honor. And that's error? Yes, Your Honor. And it's probably clear, obvious error to use the wrong guidelines manual? Under Alano Prong 2? Yes, under Alano Prong 2, yes. We essentially focus simply on the effect on the substantial rights and then the second... we normally assume that screwing up the guidelines calculation impacts substantial rights. Well, I think that there are sort of both... I think we still satisfy the test in Malina Martinez. And this is a very unique case in terms of what the... what influence the guideline range had or did not have, essentially, on the sentencing. So we think under the Malina Martinez standard, there was not an effect on substantial rights, and the record makes that clear. And also that this is not a case where any discretion by this court should be exercised to respond to that. And the reason is that the cases where there are findings of sort of this kind of negative effect from the guideline range are cases where the guidelines range was a numerical range. And there was, accordingly, evidence from that record that there was some tethering to that type of numerical range. All of the cases that the defense cites were in that context where the range would say... That may be true, but I guess I'm talking about the language of Malina Martinez. Now, interesting question about how this can be squared with the way the plain error rule is written. But I guess I read Malina Martinez to state a general rule of... is when the district court screws up calculating the guidelines, absent evidence to the contrary, we will assume that had an effect on the district court sentence. Because even though Booker has happened, like, you know, the guidelines exerted significant gravitational force on federal sentencing. That's the premise of federal sentencing. So when a district court gets the guidelines range wrong, we presume. And absent... I mean, this case would obviously be a lot easier if the district court had said, even if I got the guidelines wrong, I'd still give you the exact same sentence. But this district court did not say that. So why don't I properly understand Malina Martinez as saying, in all but a relatively uncommon case, I assume that when a district court screwed up the guidelines that that had an effect on substantial rights? Well, I guess first I'll say that I think the Malina Martinez ruling was more narrow than what you're describing, Your Honor. So Malina Martinez was reacting to a very specific and limited-to-the-Fifth-Circuit rule that required that the defendant present additional evidence of prejudice, essentially, from an error in the guidelines range. And Malina Martinez, at page 203, says that its decision simply states that courts reviewing sentencing errors cannot apply a categorical rule requiring additional evidence in cases like this one, and also like the one before this court, where the district court applied an incorrect range but nevertheless sentenced the defendant within the correct range. And that is what essentially the holding of Malina Martinez was, was rejecting this Fifth Circuit approach. And I'll also note that the... Sure, but, I mean, I'm just going to read from you the end of the first paragraph of Malina Martinez, which says, absent the evidence... I'm sorry, sorry, that's the range. I'm going to find it, but you... There is language in Malina Martinez that is broader than that, right? Right, I understand that, Your Honor. But even then, Malina Martinez said... was basically saying that you... even though there may be... Okay, so sorry, here we go. When the defendant is sentenced under an incorrect guidelines range, whether or not the ultimate sentence falls within the correct range, the error itself can and most often will be sufficient to show a reasonable probability. That is a flat-out statement of the Supreme Court in Malina Martinez. Yes, Your Honor. And we are saying that this is in one of the... is an exception to the most cases where that will be sufficient. Because in this case, Judge Hazel did a very thoughtful, prolonged analysis under the 3553A factors and was not tethered at all to a particular guideline range. This was a case where the government asked for a life sentence. That is a sentence that is still in the... that is not changed by any error. The defendant's requested sentence was not linked to the guidelines whatsoever. The defendant asked for 25 years, which was the mandatory minimum statutory sentence. And the court, therefore, was basically on a completely open playing field in terms of the sentence. And it very carefully exercised its discretion. And we submitted basically exactly what this court would want a district court to do in appraising this type of sentence by looking very carefully at the 3553A factors. And this was a court who had sat through the entire trial and obviously entered the sentencing hearing believing that a very substantial sentence was appropriate. And the truly only mitigating factor in what the court cited in reducing the sentence from disagreeing with the government's recommendation of life was something that also had nothing to do with the guideline range. And that was the sentence received by Stephen Jerome, which had been 150 months. And the court considered that factor, which again is not changed by any guidelines error, as the factor that caused it to give a sentence that was lower than the very, very serious potentially life sentence that was otherwise warranted. The court referred repeatedly to deterrence, to its very careful appraisal of what effect its sentence would have when it was distinguishing between sort of a life sentence and a very substantial 30- to 35-year sentence. And it imposed this, I mean, 35-year sentence based with its only reference point to the disparity between a sentence for Rodney Coby and a sentence for Stephen Jerome. And I think that the court's points are looking to the textual point. It is true in this case that the court did not make the statement that it would have imposed the same sentence no matter what. It's clear in this court's authority that that is not required. And I think the most telling quote about that is in page 12. This court has said for a number of years now that if a district court says that, we will give that a great deal of weight. And at some point, every district court judge is aware of that. And at some point, I mean, I don't think you can read too much into this, but the argument on their side is since every district court judge knows that this court would give substantial weight if it says the words, even if I'm wrong about the guidelines, I'd do the same thing, you can perhaps draw some inference from the fact that a district court doesn't say those words. Your Honor, well, I think here... I guess I quibble a bit with the premise of that. So I will say in the United States versus... You're quibbling with the premise that every single district judge in the Fourth Circuit knows that if they say the words, I would do the same thing anyway? Well, I think that they do know that, but at the same time, there is no requirement to say that. And here, we do submit that the rest of the record makes clear what was implied, that this was the sentence that based on the consideration of all of these factors... Your Honor, you make a persuasive argument that because the guideline was life, if he's going to depart, he gets a free slate and pick the sentence based on 3553. The question I have, though, is if he's confronted with a guideline that says 360 to life, and he says, I want to create a variance, would he then go down from 360? In other words, he's starting out with a background that life is on the table, and that's the only recommended sentence, and he would have to create a variance, and he did create a variance. But if he got a guideline range of 360 to life, would he then feel free, and did he have some desire to go further down? We don't know that. You indicate that he selected a sentence on a clean slate, and therefore, this is more likely not in relation to a range, but to his independent determination of how many years the man should serve. That may be right. Incidentally, you note Judge Hazel is no longer serving, and now somebody else would have to, if we were to order resentencing, somebody else would have to resentence him. That is correct, Your Honor. I think the language in the sentencing transcript that I would point to that most clearly shows that Judge Hazel would have reached this sentence, no matter the guideline range, is on page 1282 of the joint appendix. And then after having imposed this sentence for all of the factors under 3553A that he's considered, he says, essentially as an afterthought, he sort of notes that it's a variance. So he obviously was not concerned with or thinking about it as a variance sentence at that point. He says, quote, the sentence that I have imposed does not fall within the guideline range. It's a, I don't know, slight. The guideline range was life, so it's a variance down from a life sentence. And the court's findings generally on the 3553A factors and purposes explains the court's reasoning. But I will also specifically point to the need to avoid unwarranted sentencing disparities in this case. So he does refer back to the guidelines then as saying, essentially as showing that he was not thinking about that and tethered to that at the time. He had been clear at the beginning of the sentencing hearing, which is at JA page 1247, he emphasized that this was not a mandatory life case. So he was very aware and attuned to the fact that life was, yes, on the table, as it will be on the table still, because the government was arguing, either way, arguing for life. We'll be arguing for a guideline sentence in this case. But he was very clear that this was not a mandatory life case. And he referred essentially to the combined mandatory minimums, the fact that he was essentially above that range, and then the only mitigating factor that he cited throughout and relied on in the sentence was avoiding the unwarranted sentencing disparities, because this was a case where, as Judge Hazel acknowledged, Mr. Kobe had killed two people. And he said he was entitled to take into consideration the death of Anthony Davis as well as the death of Angela Bailey and the fact that Kobe had continued to distribute fentanyl after knowing, or after there was evidence that he knew that Angela Bailey had died from the use of that fentanyl. So this was an exceptionally serious case. And he was able to and looked at every single factor without any numerical tethering from the guidelines to find the appropriate sentence for Mr. Kobe. And the fact of the way he described this, and particularly that reference on page 1282 of the Joint Appendix shows that this was the sentence that he believed was appropriate under all circumstances. And he also believed it was appropriate, so he imposed that sentence and then did go and reduce it by, I mean, so the sentence on count five ended up being 420 months. And then he also included in his 40-year sentence the five years under Section 924C that by statute would run consecutively to whatever the guideline sentence was imposed. So in that respect, also, he was not tethering anything to the guideline range. He found the appropriate sentence for Mr. Kobe, then he did assign, I mean, he thought about it, he was reasoned about it, and he assigned the sentences by count to overall meet that appropriate sentence. So here that is evidence that we think fully satisfies the Molina-Martinez standard to show that this was a sentence he would impose again, and it was not linked to what the guideline range was. I will, if I may proceed briefly to the Pinkerton argument that the Court, also addressed. And I think, again, responding to Judge Heitens' point, that yes, even assuming that there was error here and whether or not it was preserved, the special interrogatory does fully resolve this question. The government does submit that Pinkerton liability in this circuit applies to both the penalty and substantive components of Count 5. As the Court noted, the Ham decision has been limited to the Sixth Circuit, and I think that saying that it was just decided in 2020 doesn't really capture the limitation because it was explicitly based on a decision that was suddenly from about the year 2000. So that principle has been around in the Sixth Circuit for quite some time and has not been adopted anywhere else. And I believe, or we submit, that this Court's approach to cases under 924C makes clear that there is no distinction under Pinkerton between the substantive offenses and sort of different substantive offenses that happen to have substantial penalties. And for that, we rely on United States v. Gillespie, 27F4 at 941, where Judges Niemeyer and Heitens, you were on that opinion, in terms of 924C, and it is also fully consistent with the approach that this Court takes to sentencing for the drug weight, which similarly have very substantial penalties. We don't see any inconsistency as Defense Counsel cites between Ervin and this Court's approach more generally because for Ervin also the question for those conspiracy cases is what is the scope of the agreement? And that is what impacts the, makes it relevant, what drug weight was sort of specifically foreseeable to those individuals. But the rules under Pinkerton apply and there is no exception to those based on what the penalties happen to be for the substantive offense. And that's essentially the approach that the defense is arguing for in this case. I would also say that even under the Ham decision, there would be no issue with this verdict. Again, Ham did not have a special verdict form. We do have one here. The government in its argument never referred to Pinkerton and relied fully on its position that Coby distributed the drugs to Angela Bailey, and that is what the jury specifically found in its verdict. So looking at the jury instructions as a whole and the evidence as a whole has to include the special interrogatory that was very clearly answered at page 1141 of the Ham verdict, the government proved beyond a reasonable doubt that the use of the fentanyl distributed by the defendant, Rodney Mondell Coby, resulted in the death of Angela Bailey. So again... Well, I don't know the extent to which you can actually look at the evidence presented, but maybe you can. But the evidence presented focused on Coby and did not and your whole case was based on direct communications between Coby and the decedent and the meeting and the timing and, of course, the analysis. Yes, absolutely, Your Honor. And I think the defense refers to the fact that she was, I mean, that Angela Bailey, I mean, she was also with Stephen Jerome, but for both of them, the undisputed source was Coby. And again, the only indication of any source of supply that appeared in this record for Angela Bailey around the time of her death was Coby, whom she met within two hours of passing away from the fentanyl overdose. And if the Court has no other questions, thank you. We'll hear from you. Your Honor, I'm just going to reply with respect to the sentencing issue. The arguments that we hear from the government are exactly the arguments that governments on prior occasions have made to this Court that this Court has squarely rejected. In United States v. Gomez, which was a 2012 case, the government unsuccessfully contended, like here, that because the Court arrived at the 24-month sentence purely through reference to Section 3553A factors, especially deterrence, that a remand to recalculate the advisory range would be a pointless exercise. The Gomez Court was unconvinced, noting that although the District Court did a commendable job in considering the factors in determining the sentence, we are unable to state with any certainty that it would have been the same sentence. Similarly, this Court had the opportunity in Peral Dominguez, which was a 2015 case, to consider the government's arguments that the District Court placed great importance on the advisory factors. However, this Court could not quote, embrace the government's assertion that the wrongly calculated guidelines range had no effect on Dominguez's sentencing when it potentially took more than three years of a man's life and thus the error was not harmless. The government has failed to cite a single case in this circuit in which the District Court improperly calculated the guidelines range and the sentence was still upheld, except in circumstances where the District Court clearly and plainly said that its sentence would not be affected by the guidelines. And I listed in my brief the cases from this circuit, Mills, Gomez, Jimenez, Docter, Berenet, and Albaz, and the reasons that those sentences were upheld despite  did not have a clear understanding of the guidelines. By contrast, what we have, the state of the law, is as Judge Hyten's referenced from Melina Martinez at pages 330 to 31, excuse me, are that the error itself can and most often will be sufficient to show a reasonable probability of a different   reasonable probability of a different outcome absent the error. Judge Niemeyer, you asked whether or not it would be possible that the court felt, because if the guidelines had been 360 to life, maybe the District Court would have felt inclined to vary downward at that point. We don't even have to speculate as to whether the District Court might have felt inclined to vary below the 360 months because even if the guidelines had been, if they had been properly calculated at 360 months to life, we know the District Court was contemplating even a within guidelines sentence of 30 to 34 years. We see that at pages 1256 and 1257 of the record where the court was thinking to itself that maybe a sentence that would get Mr. Kobe out of jail at age 63, 65, or 67 would be sufficient. If the range had been properly calculated, the District Court would not have even had to consider doing a variant sentence. Below 360, it still could have imposed a 30 to 34-year sentence which would have been within the properly calculated range. But we clearly don't have that because as was contended by the government at sentencing and as was on the brain of the District Court, he knew that this was a guidelines case of life-to-life and that the government was asking for a guidelines sentence of life. Your Honor, I would respectfully ask that you decide that this is the appropriate case to exercise plain error review. This is a plain error of constitutional dimension where there was a violation of the ex post facto clause. This is a plain error of the type that takes somebody from life where they could have gone down to 360 months as the starting point. Any one of us would have rather been looking at 30 years of potential incarceration as the starting point. Mr. Kobe lost the benefit of that. And I think that it would really hinder the public's reputation of judicial proceedings to know that the District Court missed the error, defense counsel, the prosecutor missed the error, the probation officer missed the error. Now this error has been recognized as clear by the government on appeal, but this error is just going to be swept under the rug, so to speak, because we think that recitation of the 3553A factors is sufficient. It's not. The Supreme Court has said so. This precedent in the Fourth Circuit has said that recitation of those factors alone is not enough, and there is no clear express language by the District Court that its sentence would not have been impacted by the improper guidelines. Thank you so much. Thank you, Ms. Bowman. I notice you were court appointed, and I appreciate that. It's a pleasure to serve, and it makes our system especially unique in the world. Thank you for your service and your good arguments. We'll come down and greet counsel. Adjourn the court. Signee die.
judges: Paul V. Niemeyer, Toby J. Heytens, Henry F. Floyd